Opinion issued July 12, 2007 





 













In The

Court of Appeals

For The

First District of Texas






NO. 01-07-00161-CV

__________


PROSPERITY BANK, Appellant


V.


KRIS ROGGE, Appellee






On Appeal from the 215th District Court

Harris County, Texas

Trial Court Cause No. 2006-61493






MEMORANDUM OPINION

 Appellant, Prosperity Bank, brings this accelerated interlocutory appeal, (1)
challenging the trial court's order denying its application for a temporary injunction
to enjoin its former employee, appellee, Kris Rogge, from competing or engaging in
a business similar to Prosperity for a period of one year. In two issues, Prosperity
contends that the trial court abused its discretion in denying its application for a
temporary injunction and erred in finding the non-competition provision of the
retention agreement to be unenforceable as a matter of law because of its geographic
limitation. 

 We affirm. 

Factual and Procedural Background


 In its original petition and application for injunctive relief, Prosperity, a Texas-based bank, which operates throughout Harris County and the State of Texas, alleged
that it "relies on confidential and proprietary information . . . developed over the
course of many years and maintained at great cost, to service its customers and obtain
new customers." Prosperity provides its officers with this confidential information,
including "highly specialized training regarding [its] methodologies and business
strategies," "information relating to actual and potential customers, suppliers,
partners, joint venturers, financing sources . . . , and marketing and merchandising
techniques," to equip their officers "to grow Prosperity's business relationships." On September 1, 2002, Prosperity acquired Paradigm Bank and hired Rogge,
who was a vice president at Paradigm, to serve as one of its vice presidents. Rogge
and Prosperity executed a retention agreement, which provided an initial term of
employment for one year, renewable by either party on a month-to-month basis. The
retention agreement, which Prosperity attached to its petition, further provided, 

7. Non-Disclosure Obligations. In conjunction with this Retention
Agreement, Prosperity Bank agrees to provide Executive, on or about
the Effective Date, with immediate access to Confidential Information
(as defined below) relating to Prosperity Bank's business and to highly
specialized training regarding Prosperity Bank's methodologies and
business strategies, which will enable Executive to perform his or her
job for Prosperity Bank. Executive also will have immediate access to,
or knowledge of, new Confidential Information of third parties, such as
actual and potential customers, suppliers, partners, joint ventures,
investors, financing sources, etc., of Prosperity Bank. Executive agrees
that he will not, at any time during or after his employment with
Prosperity Bank, make any unauthorized disclosures, directly or
indirectly, of any Confidential Information of Prosperity Bank, or third
parties, or make any use thereof, directly or indirectly, except in working
for Prosperity Bank.


As used herein, "Confidential Information" means and includes
Prosperity Bank's confidential and/or proprietary information and/or
trade secrets that have been and/or will be developed or used and that
cannot be obtained readily by third parties from outside sources.
Confidential Information includes, but is not limited to, the following:
information regarding customers, employees, contractors, and the
industry not generally known to the public; strategies, methods, books,
records, services, and process; procurement procedures, pricing, and
pricing techniques; information concerning past, current, and
prospective customers, investors, and business affiliates . . . ; pricing
strategies and price curves; positions; plans or strategies for expansion
or acquisitions; budgets; research; financial and sales data; trading
methodologies and terms; communications information; evaluations,
opinions, and interpretations of information and data; marketing and
merchandising techniques; electronic databases; models; specifications;
computer programs; contracts; bids or proposals; technologies and
methods; training methods and processes; organizational structure;
personnel information; payments or rates paid to consultants or other
service providers; and other such confidential or proprietary information
. . . .


8. Non-Competition Obligations. Executive agrees that . . . Executive
will not . . . directly or indirectly:

 

(a) compete or engage, anywhere in the geographic area comprised of
Houston, Texas and the fifty (50) mile radius surrounding Houston,
Texas (the "Market Area") in a business similar to that of Prosperity
Bank, or compete or engage in that type of business which Prosperity
Bank has plans to engage in, or any business which Prosperity Bank has
engaged in during the preceding twelve (12) month period if Executive
had access or potential access to information regarding the proposed
plans or the business in which Prosperity Bank engaged;


(b) take any action to invest in, own, manage, operate, control,
participate in, be employed or engaged by or be connected in any
manner with any partnership, corporation of other business or entity
engaging in a business similar to that or Prosperity Bank anywhere
within the Market Area . . . . 


(c) call on, service, or solicit competing business from customers or
prospective customers of Prosperity Bank if, within the twelve (12)
months before the termination of Executive's employment, Executive
had or made contact with the customer, or had access to information and
files about the customer


. . . .

9. Non-Competition Period. The Non-Competition Obligations set forth
in Section 8 above shall apply for the following duration ("Non-Competition Period"):

 

(a) a period of twelve (12) months after the termination of Executive's
employment with Prosperity Bank in the event such employment is
terminated (i) by Executive or (ii) by Prosperity Bank with Cause (as
defined in Section 4 hereof) . . . .


 Sometime after Prosperity promoted Rogge to the position of President of its
Tanglewood Banking Center, she notified Prosperity by letter that she had been
"recently offered a position with another bank" and she did not believe that such
employment "would contravene" her retention agreement. Rogge stated that she
would agree to "return any and all Confidential Information and to not solicit
Prosperity Employees," she "would neither take nor use any confidential information
with regards to Prosperity customers," and she looked "forward to meeting and
working through these issues." In a letter dated September 26, 2006, Prosperity
responded that it would consider Rogge's employment by another bank within the 50-mile radius, without a prior release, to constitute tortious interference. It also
threatened to include "that bank in any subsequent litigation." 

 On September 27, 2006, Rogge sent a second letter to Prosperity informing it
that, in order to accept her offer at the other bank, she needed a "release from the
terms of the Retention Agreement to eliminate any possibility or threat involving the
prospective employer in any litigation over the agreement." Rogge contended that
the non-compete clauses in the retention agreement were unenforceable, and she
demanded a release by October 6, 2006. Rogge stated that if she did not receive the
release by that date, she would file suit "seeking a declaration from the court that the
non-compete clauses are unenforceable." Rogge noted that if Prosperity's failure to
timely release her from the agreement "result[ed] in loss of the new job opportunity,
[she would] also hold the bank responsible for all damages and costs."

 In its petition, Prosperity asserted claims for declaratory relief and breach of
contract. In support of its request for injunctive relief, Prosperity alleged that it had
a probable right to recover regarding "Rogge's probable use and/or disclosure of
Prosperity's confidential information" and "competition against Prosperity during the
first year after termination of her employment." It further alleged that Rogge's
conduct would cause "irreparable damage to its business development and long-standing customer relationships" and to its "current and prospective ability to
compete in the marketplace." Prosperity sought an order enjoining Rogge from
competing or being employed by "a business similar to that of Prosperity for a period
of one year after termination of her employment . . . within Houston, Texas and a fifty
mile surrounding radius" or making any unauthorized disclosures of confidential
information. The trial court issued a temporary restraining order on September 28,
2006. 

 In her answer and counterclaim, Rogge alleged that she had received an offer
of employment, but she could not accept it because of Prosperity's "threat to involve
the prospective employer in protracted litigation." Rogge asserted, among others,
claims against Prosperity for tortious interference on the basis that she could have
gone to work for another prospective employer but for Prosperity's interference. 
Rogge also sought a preliminary injunction to prevent Prosperity "from attempting
to enforce an illegal contract" and causing the loss of her prospective employment
opportunities. Rogge attached an affidavit, in which she testified that she had been
offered a job conditioned upon obtaining a full and final release from the agreement,
she had accepted the job conditioned upon obtaining the release, and that the job had
"a limited period of time" in which she could accept it. Rogge further testified that
if she did not obtain the release by October 6, 2006, the job offer "may be
withdrawn."

 Prosperity filed a brief in support of its application for a temporary injunction
and attached to it Rogge's deposition testimony. In her deposition, Rogge testified
that her prospective employer, Frost Bank, did not want to hire her unless she was
released from the retention agreement. Specifically, Rogge agreed that Frost had
"made it clear" that it would not hire her "absent either a ruling that says you can go
compete or Prosperity Bank releasing you from that retention agreement." 

 In an order dated November 20, 2006, the trial court found that Prosperity was
entitled to injunctive relief, but that it had reservations about the geographic scope
of the non-compete clauses in the retention agreement. On January 23, 2007, the trial
court held a temporary injunction hearing. At the hearing, Rogge testified that she
submitted her resignation to Prosperity effective January 31, 2007 and that she had
no plans to begin working elsewhere. Rogge explained that her offer from Frost
Bank was no longer available and that she would be unemployed because she did not
know what else she could do. Rogge stated that until she received a ruling, she would
not "go out" and compete against Prosperity. 

 On February 22, 2007, the trial court signed a supplemental order, finding that
the agreement was ancillary to an otherwise enforceable agreement, Rogge was given
confidential information, and "the non-competition was supported by adequate
consideration." However, the trial court determined that the geographic scope of the
agreement was unreasonable as a matter of law. After noting that Prosperity had not
sought reformation of the geographic scope of the agreement, the trial court ruled that
the non-competition provision of the agreement was unenforceable. The trial court
subsequently signed findings of fact and conclusions of law. 

Standard of Review

 The purpose of a temporary injunction is to preserve the status quo of a
litigation's subject matter pending trial. Butnaru v. Ford Motor Co., 84 S.W.3d 198,
204 (Tex. 2002). Trial courts have broad discretion in deciding whether to grant or
deny a temporary injunction, and the standard of review is clear abuse of discretion. 
Tel. Equip. Network, Inc. v. TA/Westchase Place, Ltd., 80 S.W.3d 601, 607 (Tex.
App.--Houston [1st Dist.] 2002, no pet.); see also T.F.W. Mgmt., Inc. v. Westwood
Shores Prop. Owners Ass'n, 162 S.W.3d 564, 567 (Tex. App.--Houston [14th Dist.]
2004, no pet.). Accordingly, we will not reverse a trial court's order granting or
denying a temporary injunction unless it is "so arbitrary as to exceed the bounds of
reasonable discretion." Tel. Equip. Network, Inc., 80 S.W.3d at 607. An erroneous
application of the law to undisputed facts constitutes an abuse of discretion. Id. We
draw all legitimate inferences from the evidence in the light most favorable to the trial
court's order. Id.

 To obtain a temporary injunction, an applicant must plead and prove (1) a
cause of action against a defendant; (2) a probable right to the relief sought; and (3)
a probable, imminent, and irreparable injury in the interim. Butnaru, 84 S.W.3d at
204. A probable right of relief is shown by alleging a cause of action and presenting
evidence that tends to sustain it. T-N-T Motorsports, Inc. v. Hennessey Motorsports,
Inc., 965 S.W.2d 18, 23-24 (Tex. App.--Houston [1st Dist.] 1998, pet. dism'd). An
irreparable injury is shown if there is no adequate remedy at law, i.e., the applicant
cannot be adequately compensated in damages or damages cannot be measured by
any certain pecuniary standard. Butnaru, 84 S.W.3d at 204; see also Ahmed v. Shimi
Ventures, L.P., 99 S.W.3d 682, 692 (Tex. App.--Houston [1st Dist.] 2003, no pet.).

Temporary Injunction

 In its first issue, Prosperity argues that the trial court abused its discretion in
denying its application for a temporary injunction because the retention agreement
satisfied the requirements of the Covenants Not to Compete Act. See Tex. Bus. &
Com. Code Ann. § 15.50-52 (Vernon 2002). In response, Rogge argues that the
retention agreement is not enforceable, Prosperity has not shown a probable right of
success, the restraints in the covenant not to compete are unreasonable, and Prosperity
has failed to show a probable or imminent injury. Rogge's final argument is
dispostive.

 As Rogge notes, the evidence presented to the trial court at the temporary
injunction hearing is that "Rogge had no intention of competing against Prosperity
without a release from the obligations imposed by the [r]etention [a]greement." For
example, in Rogge's September 25, 2006 letter, Rogge informed Prosperity that she
had been "recently offered a position with another bank," later disclosed to be Frost
Bank. Although Rogge contended that such employment would not violate her
retention agreement, Rogge also stated that she wanted to "work[] through these
issues." Prosperity responded by stating that it would consider Rogge's employment
by another bank within the 50-mile radius, without a prior release, to constitute
tortious interference. Prosperity threatened to include Frost Bank, or any other
employing bank, in subsequent litigation. Rogge then immediately sent Prosperity
another letter making clear that she needed a release from the retention agreement to
"accept an offer at another bank," so as to ensure that Prosperity would not threaten
to involve her prospective employer in litigation. Although Rogge contended that the
non-compete clauses were unenforceable, she demanded a release by October 6,
2006. Absent receiving a release, Rogge stated that she would seek a declaration
regarding the enforceability of the non-compete clauses. Rogge also noted that if
Prosperity failed to timely release her from the retention agreement and she lost the
new job opportunity as a result, she would hold Prosperity responsible for all
damages and costs. In neither of her letters did Rogge threaten to violate the
retention agreement by accepting another job, with Frost Bank or with any other
employer. In fact, Rogge clearly stated that she would not take another job with a
competing bank because no prospective employers wanted to become involved in
litigation over her hiring. By including a demand for a release by a date-certain and
by referencing the possibility of losing her new job based on Prosperity's conduct,
she further indicated to Prosperity that she did not intend to take the job absent a
release.

 In her pleadings, Rogge noted that she had no intention of accepting alternative
employment without a release and that she could not accept the offer from Frost Bank
because of Prosperity's threat of "protracted litigation." In her affidavit, attached to
her pleadings, Rogge testified that her job offer from Frost and acceptance of it were
conditioned upon obtaining a full and final release from the retention agreement and
that the job would be held open only for "a limited period of time." Rogge noted that,
without a release, the job offer could be withdrawn. Furthermore, in her deposition,
Rogge confirmed that Frost Bank had "made it clear" that it would not hire her
"absent either a ruling" authorizing her competition with Prosperity or a release from
Prosperity. Finally, at the temporary injunction hearing, Rogge testified that her
resignation from Prosperity would be effective January 31, 2007, she had no plans to
begin working elsewhere because she did not know what she could do in light of the
retention agreement, and her offer from Frost Bank was no longer available. 

 Rogge admits in her briefing that "she wants to and would compete with
Prosperity if permitted." But Rogge notes in her briefing that there "is no evidence
that Rogge has breached or has expressed any intention of breaching the non-competition clauses of the [r]etention [a]greement without approval of some sort,"
and the record also demonstrates that Rogge intends to "get[] relief from the
[r]etention agreement, voluntarily or by court order, before competing with
Prosperity." 

 Here, we hold that the evidence is legally insufficient to support a finding that
irreparable harm to Prosperity is probable or imminent. Rather, the record establishes
"only a fear of possible injury," and such a contingency "is not sufficient to support
issuance of a temporary injunction." Reach Group, L.L.C. v. Angelina Group, 173
S.W.3d 834, 838 (Tex. App.--Houston [14th Dist.] 2005, no pet.) (citing EMSL
Analytical, Inc. v. Younker, 154 S.W.3d 693, 697 (Tex. App.--Houston [14th Dist.]
2004, no pet.)).

 In EMSL Analytical, EMSL required Younker, a microbiology lab manager, to
sign a covenant not to compete and nondisclosure agreement prior to starting
employment. 154 S.W.3d at 694. When Younker resigned from EMSL and began
working for Lockheed, one of EMSL's former customers, EMSL sued Younker and
sought injunctive relief. Id. at 694-95. Younker testified that she had not disclosed
EMSL's confidential information to Lockheed and that her job responsibilities were
completely different at the two companies. Id. at 694. The court recognized that
although there was evidence that Younker was violating the noncompete clause by
working for a former customer, there was no evidence that Younker was actually
violating the nondisclosure clause or that there was any likelihood that she would in
the future. Id. at 697. EMSL presented testimony only that there was a "potential"
that Lockheed could ask her to do things that would involve EMSL's confidential
information, EMSL was "concerned" that it could suffer irreparable harm if Younker
was not prevented from working for Lockheed during the pendency of the lawsuit,
and EMSL could "envision" a situation in which Younker might confer some of
EMSL's confidential information to a third party. Id. at 696. Our sister court held
that EMSL established only "a theoretical possibility that Younker could take
Lockheed away as a customer" as well as "a theoretical possibility that Younker
could divulge EMSL's confidential information to Lockheed or some other entity." 
Id. at 697. On the other hand, Younker's uncontroverted testimony refuted both of
EMSL's theoretical reasons for needing a temporary injunction. Id. The court
concluded that EMSL "failed to establish that it faced probable, imminent, and
irreparable injury in the absence of a temporary injunction." (2) Id. at 698 (citing
Butnaru, 84 S.W.3d at 204). Similarly, in this case, there is no evidence in the
record to support a finding that irreparable injury to Prosperity is probable or
imminent in the interim if a temporary injunction is not issued. See id. Accordingly,
we further hold that the trial court did not abuse its discretion in denying Prosperity's
application for a temporary injunction.

 We overrule Prosperity's first issue. (3) 

 Conclusion


 We affirm the order of the trial court denying Prosperity's application for a
temporary injunction.


 Terry Jennings

 Justice


Panel consists of Justices Taft, Jennings, and Alcala.
1. See Tex. Civ. Prac. & Rem. Code Ann. § 51.014(a)(4) (Vernon Supp. 2006).
2. The court began its analysis by noting that the case did not present the typical
covenant not to compete case where a former employer goes to work for a competitor
and tries to take customers away. See EMSL Analytical, Inc. v. Younker, 154 S.W.3d
693, 696 (Tex. App.--Houston [14th Dist.] 2004, no pet.). In the instant case there
is no evidence in the record that Rogge was actively working for, or had any imminent
or immediate plans to work for, a competitor at the time Prosperity sought injunctive
relief. 


 In its reply brief, Prosperity asserts that Rogge's briefing on this issue "relies on out
of date evidence . . . to create a false impression that Prosperity is in no danger of
imminent harm." Although Prosperity concedes that Rogge's citations to the record
evidence are "technically accurate," Prosperity avers, without citation to any record
evidence, that "the present day reality is that Rogge has accepted a banking position
with First Community Bank and is actively soliciting Prosperity customers in
violation of the provisions in the retention agreement." However, in conducting our
review, we may not rely on unsupported assertions in appellate briefing, and instead
must review the record before us. See Tex. R. App. P. 38.1(f), (h) (requiring factual
statements in briefs to be supported by record references).
3. Having held that there is no evidence in the record to support a finding that
irreparable injury to Prosperity is probable or imminent, we need not consider
Prosperity's second issue, in which Prosperity argues that the trial court erred in
finding that the non-competition provision of the retention agreement was
unenforceable as a matter of law because of its geographic limitation.